**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 20, 2015**

# In the Court of Appeals of Georgia

A15A0472. GASKIN v. THE STATE.

McMILLIAN, Judge.

Larry Gaskin, Jr. appeals the trial court's denial of his motion for new trial after a jury convicted him of two counts of child molestation. Because we find that the trial court committed harmful error in admitting evidence of Gaskin's prior arrests, we reverse.

Viewed in the light most favorable to support the verdict,[1] the evidence at trial showed that in February 2011, the victim, K. C., who was 15 years old, lived with her

---

[1] "[W]hen we consider the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and leave questions of credibility and the resolution of conflicts in the evidence to the jury." (Citation and punctuation omitted.) *Bryant v. State*, 296 Ga. 456, 457 (1) (769 SE2d 57) (2015).

mother, younger sister,[2] and Gaskin. One night that month, K. C. was laying in the bed with her sister, whom she was babysitting while Gaskin and her mother were out of the house. That evening, K. C. texted her mother, who was still out, and asked her to make Gaskin leave the house. When K. C. and her mother subsequently spoke on the phone, K. C. told her mother that when Gaskin came to get her sister out of the bed, he touched K. C.'s breasts. K. C.'s mother then confronted Gaskin, but he denied any wrongdoing, saying that K. C.'s assertion was "crazy." The next day, K. C., her mother, and Gaskin discussed the situation. K. C. repeated that Gaskin had been drinking and had touched her breasts, but she did not know if he had done it on purpose or not. According to K. C.'s mother, K. C. did not say that she wanted Gaskin to leave the house, and he continued to live with the family.

Approximately nine months later, in September 2011, when K. C. was visiting Charles Thigpen,[3] the father of K. C.'s other sister, she told him that Gaskin came home drunk one night, went into her bedroom, and attempted to have sex with her by "reach[ing] down into her panties." K. C. told Charles that afterwards she was given

[2] The younger sister is the child of Gaskin and K. C.'s mother.

[3] To avoid confusion, we will refer to the Thigpens, individually, by their first names.

a cell phone and $100. Charles spoke with Gaskin and K. C.'s mother and was told that it was all a misunderstanding and that they had dealt with the matter. However, Charles told his wife, Quineisha, what K. C. had said. When Quineisha spoke with K. C., K. C. told her that Gaskin tried to have sex with her, that she kicked him off of her, and that he had exposed himself to her. The next day, Quineisha called a counselor at K. C.'s school to report the incident. The counselor spoke with K. C., who admitted she had told Quineisha about the incident involving Gaskin. The school then notified the police and the Department of Family and Children Services about the matter.

Detective David Remec of the Atlanta Police Department spoke briefly with K. C. at the school that day, and she told him that Gaskin had touched her in a sexual manner sometime in or around February 2011. She also told Remec that Gaskin had given her a cell phone and some money to try to keep her quiet. Remec then arranged for a forensic interviewer to question K. C.

K. C. told the forensic interviewer that in February 2011, Gaskin had come home intoxicated, entered the room where she was in bed with her sister, and asked K. C. if anyone was home. When K. C. told Gaskin no one else was there, he went into the bathroom and then came back and started touching her breasts and the outside

of her vagina. She said that, afterward, he offered her money not to tell anyone what had happened. K. C. said that Gaskin gave her $100 and bought her a phone two days after the incident. A recording of K. C.'s forensic interview was played for the jury.

However, during her direct examination at trial, K. C. either denied that anything happened in 2011 or stated that she did not remember. K. C. said that she did not want to talk about what had happened because she felt that she was responsible for her younger sister not getting to see Gaskin, who was her sister's father, and that upset K. C. However, K. C. testified that she recalled having a conversation with Gaskin and her mother about Gaskin touching her. She also testified that she received money and a cell phone from Gaskin. Additionally, she recalled talking with police, the counselor at her school, and someone else, but she said that she did not remember or did not know what those conversations were about. But on cross-examination, K. C. admitted telling her mother that Gaskin had accidentally touched her breasts, telling the Thigpens that Gaskin had tried to have sex with her, and telling the forensic interviewer that Gaskin had touched her breasts and vagina.

After the State rested, Gaskin called K. C.'s mother as a witness for the defense to testify as to his reputation for truthfulness. Gaskin also testified and denied ever

4

improperly touching K. C. Moreover, both Gaskin and K. C.'s mother testified that K. C. had received the cell phone and the $100 for her birthday.[4]

1. Gaskin argues on appeal that the trial court erred when it allowed the State to question K. C.'s mother about his prior arrests.

During Gaskin's trial, his counsel asked K. C.'s mother if she was aware of Gaskin's reputation in the community for truthfulness, and she replied, "Yes." But when defense counsel began to ask a follow-up question, the State objected to any testimony regarding specific examples of his good reputation. Gaskin's counsel replied that he did not want to ask about specifics, and after the trial court reviewed the questions that counsel planned to ask, it allowed him to proceed. Gaskin's counsel asked only one more follow-up question: whether knowing Gaskin's reputation for truthfulness in the community, K. C.'s mother would believe testimony that Gaskin gave under oath.[5] K. C.'s mother again replied in the affirmative.

_____

[4] We find that the evidence at trial was sufficient to support his convictions beyond a reasonable doubt under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[5] Although former OCGA § 24-9-84 (4) permitted counsel to ask this question, Georgia's new Evidence Code does not contain a similar provision, and one commentator has opined that this omission "suggests legislative rejection" of the question. See Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 290-91 (3d ed. 2015).

On cross-examination, the prosecutor asked K. C.'s mother if her opinion of Gaskin's reputation for truthfulness would change if she were aware that he had been arrested "on a couple of occasions." K. C.'s mother replied that her opinion would not change and that she was aware of his prior arrests. At that point, Gaskin's counsel objected to any questions about the specific arrests, but after a bench conference, the trial court stated that the prosecutor could ask about "the three arrests that you know about over the defendant's objection." The prosecution then asked K. C.'s mother if she was aware of four prior arrests: for possession, manufacturing, or distribution of marijuana; simple battery; criminal damage to property; and obstruction of a person making a 911 call.

In his motion for new trial, Gaskin asserted that the admission of this evidence was error, and the trial court agreed. However, the trial court concluded, without explanation, that "this error was harmless as the Court further finds it is highly probable that the evidence did not contribute to the jury's verdict." Thus, the trial court denied Gaskin's motion for new trial.

While we agree the trial court committed error in admitting evidence of Gaskin's prior arrests, we disagree with the trial court's conclusion that the error was harmless.

(a) This case was tried in January 2013, the month that Georgia's new Evidence Code became effective. See Ga. L. 2011, p. 99, § 101. Under the new Code, OCGA § 24-6-608[6] provides very "specific, limited methods for attacking or supporting the credibility of a witness by evidence in the form of opinion or reputation." *Williams v. State*, 332 Ga. App. 546, 548 (1) (b) (774 SE2d 126) (2015). Under that statute,

> [t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, subject to the following limitations:
>
> > (1) The evidence may refer only to character for truthfulness or untruthfulness; and
> >
> > (2) Evidence of truthful character shall be admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.[7]

---

[6] We apply OCGA § 24-6-608 in this case because the evidence at issue was introduced through cross-examination in response to testimony about Gaskin's reputation for truthfulness and not under the procedures for admitting evidence of other acts for the purposes allowed under OCGA § 24-4-404 (b). See, e.g., *U. S. v. Tomblin*, 46 F3d 1369, 1389 (II) (2) (5th Cir. 1995) (procedure under Fed. R. Evid. 404 (b) that requires prosecutor to give notice of intention to use evidence of other acts does not apply to evidence introduced through cross-examination under Fed. R. Evid. 608 (b)).

[7] We note that the issue of whether Gaskin's initial character evidence was admissible under this provision is not before us in this appeal.

7

OCGA § 24-6-608 (a). The statute also addresses the use of specific instances of conduct to attack (or support) a witness's character for truthfulness, providing that "other than a conviction of a crime as provided in [OCGA § ] 24-6-609,[8] or conduct indicative of the witness's bias toward a party" such specific instances "may not be proved by extrinsic evidence." OCGA § 24-6-608 (b). However, in the trial court's discretion, evidence of specific instances of conduct

> *if probative of truthfulness or untruthfulness*, [may] be inquired into on cross-examination of the witness:
>
> > (1) Concerning the witness's character for truthfulness or untruthfulness; or
> >
> > (2) Concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

(Emphasis supplied.) Id.

Because OCGA § 24-6-608 (b) places the decision whether to admit specific instances of conduct within the trial court's discretion, we will reverse the trial

---

[8] For example, OCGA § 24-6-609 (a) (2) permits the admission of "[e]vidence that any witness has been *convicted* of a crime . . . if it readily can be determined that establishing the elements of such crime required proof or admission of an act of dishonesty or making a false statement."

court's ruling only on a clear abuse of that discretion. See *Bradshaw v. State*, 296 Ga. 650, 656 (3) (769 SE2d 892) (2015) (adopting federal "clear abuse of discretion" standard for introduction of evidence under Fed. R. Evid. 403 and 404 (b)). Additionally, because the provisions of OCGA § 24-6-608 were "borrowed from the Federal Rules of Evidence,"[9] we "look to decisions of the federal appeals courts construing and applying the Federal Rules, especially the decisions of the Eleventh Circuit." *State v. Frost*, 297 Ga. 296, 299 (773 SE2d 700) (2015). See also *Parker v. State*, 296 Ga. 586, 592 (3) (769 SE2d 329) (2015).

In interpreting Fed. R. Evid. 608, the federal provision comparable to OCGA § 24-6-608, the federal courts have found that the evidence must involve offenses or "[a]cts probative of untruthfulness" including "such acts as forgery, perjury, and fraud." (Citation and punctuation omitted.) *United States v. Novaton*, 271 F3d 968, 1006 (II) (F) (11th Cir. 2001). See also *United States v. Morgan*, 505 F3d 332, 340 (II) (C) (2) (5th Cir. 2007) ("the rule authorizes inquiry only into instances of misconduct such as perjury, fraud, swindling, forgery, bribery, and embezzlement"). However, "[t]he government may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable." (Citations and

---

[9] See Carlson, *supra* at 269, 294.

punctuation omitted.) *Morgan*, 505 F3d at 340 (II) (C) (2). Cf. *United States v. Gossett*, 877 F2d 901, 907 (D) (11th Cir.1989) ("impeachment by prior inconsistent statement may not be permitted where it is used as a stratagem to get before the jury otherwise inadmissible evidence") (citations omitted). Therefore, for example, the Eleventh Circuit has found that Fed. R. Evid. 608 (b) does not allow the admission of evidence of prior convictions or prior instances of drug use. *United States v. Sellers*, 906 F2d 597, 602 (II) (A) (1) (i) (11th Cir. 1990)*; United States v. Rubin*, 733 F2d 837, 842 (II) (11th Cir. 1984).

Applying this authority, we agree with the trial court that it was an abuse of discretion to allow the prosecution to question K. C.'s mother regarding Gaskin's prior arrests for marijuana possession, simple battery, criminal damage to property, and obstruction of a person making a 911 call, as none of these arrests related to offenses involving truthfulness. Moreover, K. C.'s mother had already testified that she was aware of Gaskin's prior arrests and that they did not change her opinion of his character. Thus, we conclude that the State's questions regarding the specific crimes involved in the arrests constituted an improper attempt to use impeachment as a guise for presenting otherwise inadmissible evidence to the jury. See *Morgan*, 505 F3d at 340 (II) (C) (2).

(b) However, in order to serve as a basis for reversing Gaskin's convictions, the trial court's evidentiary error must have affected his substantial rights, i.e., it was not harmless. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"). See Carlson, *supra* at 19 (OCGA § 24-1-103 closely tracks Fed. R. Evid. 103); 1 McCormick On Evidence § 52 (Kenneth S. Broun, ed., 7th ed. 2013) ("Federal Rule Evidence 103 (a) codifies the harmless error concept[.]"). In Georgia,

> the standard for weighing nonconstitutional error in criminal cases is known as the "highly probable test," i.e., that it is highly probable that the error did not contribute to the judgment. Under that test, a reversal is not required if the evidence of guilt is overwhelming in that there is no reasonable probability that the verdict would have been different in the absence of this error.

(Citation omitted.) *Leverette v. State*, 303 Ga. App. 849, 852 (2) (696 SE2d 62) (2010). See also *Cowart v. State*, 294 Ga. 333, 341 (4) (b) (751 SE2d 399) (2013).[10]

---

[10] The federal analysis is similar. The Eleventh Circuit has held that "[a]n erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless." *United States v. Hands*, 184 F3d 1322, 1329 (II) (C) (11th Cir.), corrected, 194 F3d 1186 (11th Cir.1999). "Evidentiary and other nonconstitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict,

Here, the evidence at trial presented the jury with a classic "he said, she said" scenario. K. C. told her mother, the Thigpens, the police officer, and the forensic interviewer that Gaskin had touched her breasts and/or vagina, while Gaskin consistently denied that he had ever touched K. C. inappropriately. The State presented no medical evidence to support the charges, instead relying primarily upon K. C.'s statements to others. Although K. C.'s multiple statements were consistent in some respects, e.g., regarding Gaskin's intoxicated condition and the circumstances surrounding the incident, her description of the extent of Gaskin's conduct varied over time. Moreover, K. C. refused to testify about the incident at trial, although she admitted her prior conversations concerning it.

Under these circumstances, we cannot say the evidence was overwhelming. And we cannot say that the fact that Gaskin had been arrested for four prior offenses did not enter into the jury's evaluation of his testimony and his credibility, and thus we cannot say that it is highly probable that this evidence did not contribute to the jury's verdict. See *Gearin v. State*, 208 Ga. App. 878, 882 (2) (432 SE2d 818) (1993) (trial court erred in denying motion for mistrial after wrongful admission of evidence

---

reversal is not warranted." (Citation and punctuation omitted.) *United States v. Khan*, 794 F3d 1288, 1299 (IV) (A) (2) (11th Cir. 2015). See also *United States v. Hawkins*, 905 F2d 1489, 1493 (II) (A) (11th Cir.1990).

of other crimes). Cf. *Cowart v. State*, 294 Ga. at 342 (5) (admission of improper evidence bolstering witness's testimony harmful error when witness's testimony was the only evidence against defendant); *Beasley v. State*, 204 Ga. App. 214, 218 (3) (419 SE2d 92) (1992) (admission of similar transactions without limiting instructions was harmful error where State's case rested solely on the credibility of State's main witness); *Anderson v. State*, 252 Ga. 103 (312 SE2d 113) (1984) (admission of improper character evidence required reversal).

Accordingly, we reverse the trial court's denial of Gaskin's motion for new trial on this ground.

2. Because we have found that Gaskin is entitled to a new trial, we need not reach his assertions that he received ineffective assistance of counsel.

*Judgment reversed. Barnes, P. J., and Ray, J., concur.*